United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ELLEN THIVIERGE,

      Plaintiff,

  v.

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY AS ADMINISTRATOR AND
FIDUCIARY OF THE MILLS PENINSULA
HOSPITALS GROUP WELFARE PLAN NUMBER
506, and THE MILLS PENINSULA
HOSPITALS GROUP WELFARE PLAN NUMBER
506,

      Defendants.

———————————————————————————/

No. C 05-0163 CW

ORDER GRANTING
PLAINTIFF'S
MOTION FOR
JUDGMENT AND
DENYING
DEFENDANTS'
MOTION FOR
JUDGMENT

    Plaintiff Ellen Thivierge filed this lawsuit against Hartford

Life and Accident Insurance Company (Hartford) and the Mills

Peninsula Hospitals Group Welfare Plan Number 506 (Plan)

(collectively, Defendants), after Defendants terminated her long-

term disability benefits.  Plaintiff now moves, pursuant to Federal

Rule of Civil Procedure 52, for judgment by the Court.  Defendants

oppose the motion, and cross-move for judgment in their favor. The matter was heard on January 13, 2006. Having considered all of the papers filed by the parties, the evidence cited therein and oral argument on the motion, the Court grants Plaintiff's motion and denies Defendants' motion.

BACKGROUND

Plaintiff worked as a director of organizational development at Mills Peninsula Hospital for approximately sixteen years, from August 20, 1970 until August 2, 1995. Her position is classified as "medium work" requiring three hours of sitting, five hours of standing and one hour of walking. The job description indicates that the job requires good organization and verbal/written communication skills, the ability to influence people and supervisory skills. As an employee of the hospital, Plaintiff was covered by its long-term disability plan (LTD Plan), which was administered by Hartford. Under the LTD Plan, a person is deemed to be totally disabled if, during the six-month elimination period and the next twenty-four months, a disability prevents her "from doing all the material and substantial duties" of her "own occupation." Administrative Record (AR) 583. After that twenty-four month period, a person is considered totally disabled if a disability prevents her "from doing any occupation or work" for which she is, or could become, qualified by training, education or experience. Id.

On January 3, 1996, Dr. Donald Ho filled out Hartford's Attending Physician's Statement of Disability for Plaintiff, noting diagnoses of lupus arthralgia, chronic fatigue syndrome (CFS) and

recurrent viral infections.  Under the prognosis section of the form, Dr. Ho marked the box indicating that Plaintiff was disabled from her own job and any other job.  Dr. Ho further noted that he expected a "fundamental or marked change in the future," and wrote "7/1/96" as the date when Plaintiff would recover sufficiently to perform her duties and return to work.  AR 379-80.

A few days later, the hospital submitted a long-term disability benefits claim to Hartford on Plaintiff's behalf, attaching the Attending Physician's statement.  The employer's statement listed "fatigue" as the reason Plaintiff stopped working.  AR 377.

Plaintiff received a letter from Hartford dated January 19, 1996, stating that it had received her claim and had begun its investigation.  AR 368.  The letter noted that it had ordered her medical records from Dr. Ho and two doctors that Dr. Ho had referred Plaintiff to see, Dr. Spencer T. Lowe and Dr. David Klonoff.

In a claims division summary report dated February 27, 1996, a Hartford examiner recommended approving Plaintiff's claim.  AR 354.  The report contained the following information:

In 1994, Dr. Ho had referred Plaintiff to Dr. Lowe for a rheumatology consultation and evaluation of systemic connective tissue disorder, positive ANA, polyarthralgias and fatigue.  Dr. Lowe had observed that "she does have some sort of 'autoimmunity' given the titer of the ANA observed.  However, she does not fit diagnostic criteria to be labeled as having systemic lupus erythematosus."  AR 353; see also AR 364-66, Dr. Lowe's Dec. 23,

3

United States District Court

For the Northern District of California

1994 letter to Dr. Ho regarding Plaintiff ("My impression is that this is a very pleasant, 43-year-old female with polyarthralgias and a marked elevation in the ANA presenting with marked fatigue who has some sort of undefined connective tissue disorder."). Dr. Lowe indicated that Plaintiff's prognosis was good.[1]

In June, 1995, Dr. Klonoff, a regional expert in CFS, had found, "There is recently a marked increase in the demands of work and home. The joints feel more painful when she is stressed." He recommended that Plaintiff seek counseling. Based on Plaintiff's July 27, 1995 visit, he had concluded that Plaintiff suffered from "CFS w/ severe job stress (i.e. dx of anxiety) too busy or tired to exercise. She needs time to heal . . . I feel patient is disabled and cannot work and should not work." Dr. Klonoff indicated that Plaintiff would be able to return to work, but at a different occupation.

On February 28, 1996, the claims division summary report was approved. The next day, Hartford sent Plaintiff a letter informing her that her claim for long-term disability benefits had been approved. The letter stated that her disability date was established to be August 3, 1995, and, following the end of the

---

[1]In January, 1996, Hartford sent a Physical Capacities Evaluation form to Dr. Lowe. The form includes such questions as, "Please check the frequency that the patient can perform the following activities" and, "Please check the exact degree of work you feel this patient is capable of performing." He returned the form, writing, "I'm sorry, but I don't have enough information to complete this form. Please see my [word undecipherable] note from Dec. 23, 1994." AR 1786-88. The note he refers to is his letter to Dr. Ho. In January, 1996, Hartford also sent a Physical Capacities Evaluation form to Dr. Ho. He did not fill out the form, writing that it was not an appropriate measure of disability. AR 400.

United States District Court

For the Northern District of California

six-month elimination period, Plaintiff's benefits became effective on February 3, 1996.  Also explained in the letter, as noted above, was that, for the first twenty-four months, total disability meant the inability to perform the material and substantial duties of one's own occupation.  But to remain eligible for continued long term disability benefits after twenty-four months, one must be unable to work in any occupation.  The letter stated that Plaintiff's "test of disability will change on February 3, 1998."  AR 350-51.

A case management summary note from March 27, 1996, states that Plaintiff "would like to work but unable due to disease-- unreliable as to when she will or will not feel good or bad. Hospital says would use her as a consultant but at present she's too unreliable as her illness dictates when she feels good or bad." AR 341.

Dr. Ho sent a letter regarding Plaintiff to Hartford dated April 3, 1996.  He wrote, "Due to the persistent nature of her difficulties and relapsing infections with associated protracted recuperative periods, I have serious doubts that she will be able to return to any gainful employment for the remainder of the year. I have extended her disability until January 1, 1997."  AR 124.

On June 6, 1996, a Hartford examiner filled out a Social Security Assistance Referral form on behalf of Plaintiff.  The counselor's comments on the form noted that, based on Plaintiff's age and education, getting Social Security benefits would be challenging; however, based on the severity of her debilitating diagnosis, Plaintiff should apply for benefits.  AR 326.  At first,

United States District Court

For the Northern District of California

Plaintiff was denied Social Security benefits.  But, in a decision dated May 21, 1997, an Administrative Law Judge determined that Plaintiff was eligible, finding that Plaintiff "suffers from lupus and chronic fatigue syndrome, which prevent her from performing even the full range of sedentary work."  The order further found that Plaintiff's subjective complaints are credible and consistent with the medical evidence of record, that she cannot lift ten pounds on a frequent basis and that she cannot perform sustained work activity for more than two to three hours in a workday.  AR 289-93.

Plaintiff continued to receive benefits from Hartford, even after the twenty-four months had elapsed and she was entitled to benefits only if she was unable to perform "any occupation."  Plaintiff submitted periodic statements from herself and her attending physician, Dr. Ho, from February 3, 1996 through 2003, when her benefits were terminated.  Dr. Ho remained Plaintiff's attending physician even after Plaintiff moved from the San Francisco Bay Area to Ashland, Oregon in 1998.  According to the statements submitted by Plaintiff and Dr. Ho, her symptoms remained essentially the same and her impairments depended largely on the severity of her flu-like symptoms.  See, e.g., AR 144, 150-154, 156-157, 174, 178-79, 198-201, 304.

In 2002, for reasons unstated, Defendants began surveillance of Plaintiff.  AR 531-551.  She was observed on two days in April, two days in May and two days in November.  In April, an investigator observed Plaintiff leaving her home, driving to town and running various errands.  According to the investigator,

United States District Court

For the Northern District of California

Plaintiff at no time appeared lethargic or tired; instead her movements "were always brisk and quick with no signs of discomfort or fatigue." AR 545.  But, during the two days, she was only observed outside her home for a couple of hours each day.  On both days, she returned home by noon and the investigator reported no "subject activity" after she returned home.  In May, Plaintiff was observed driving her children to school and going to the store.  The investigator stated that Plaintiff "was filmed getting into her vehicle twice, reaching in through her car window, reaching over her left shoulder to grab her seat belt and standing with her hands on her hips.  During the recorded video period of the subject, no sign of discomfort or fatigue was ever seen by the investigator." AR 538.  Most of the day, however, Plaintiff spent inside her home.  During the second day of observation in May, Plaintiff never left her home and no subject activity was observed.  In November, the investigator stated that Plaintiff was observed away from her home for one hour on the first day of surveillance and at least two and a half hours on the second day of surveillance.  On the first day, the investigator observed Plaintiff and her husband taking a one-hour walk, noting that they "walked briskly the whole time." AR 531.

Following the surveillance, a Hartford employee interviewed Plaintiff at her home on February 27, 2003.  AR 512-22.  During the interview, Plaintiff explained why Dr. Ho was still her attending physician: "The reason I go to California for treatment is because my husband is still employed by the policyholder, Mills Peninsula Hospital and Dr. Ho has been my longtime physician and I really

7

United States District Court

For the Northern District of California

trust him.  He is an unbelievably good physician."  AR 512.
Plaintiff visited Dr. Ho "usually bi-annually."  In Oregon, she saw
a certified Reiki Healer for energy treatment and a homeopathic
healer for nausea, but declined to provide their names, although
she later gave the name of the Reiki Healer.

During the interview, Plaintiff stated that, on good days, she
can walk twenty to twenty-five minutes, stand, sit, kneel, squat,
cook, do light housework and carry light items.  But on bad days
she experiences weakness and feels sick if she gets up, has severe
diarrhea and cannot do anything but lie down.  On a good day her
pain level is zero, but on a bad day it is ten.  On the day of the
interview her pain level was two and she stated that it was a bad
day.  She noted that she can start out having a good day and then
it will suddenly be a bad day, where she is weak and ill, which can
last up to three weeks; she can have several days when she feels
normal, but then wake up the next day feeling like she has a severe
case of the flu, which can last two days or three weeks.  According
to Plaintiff, her good days occur approximately three to eight days
a month on average, the rest are bad days; it's impossible to
predict when she will have a good day.  Even on the bad days,
however, she will still have to take her children places if her
husband is out of town and a friend is unable to take them.
Plaintiff stated that she does not have enough good days to be able
to hold down a job and that she cannot function when she
experiences the weakness and flu-like symptoms.  Plaintiff stated
that she did volunteer to be on a committee to develop a criterion
for closing a local school.  The committee met ten times for two

8

United States District Court

For the Northern District of California

hours a week from September, 2002, to November, 2002.  Although she sometimes felt unwell, Plaintiff stated, she still attended the meetings because she very much wanted to stay on the committee. She became the informal leader of the group and gave the presentation to the community and the school board.  But when it was over, Plaintiff stated that she crashed hard and went to bed for a week.[2]

Near the end of the interview, the Hartford employee showed Plaintiff the surveillance videos.  According to the Hartford employee, "Mrs. Thivierge watched the surveillance films attentively.  Mrs. Thivierge stated that the activity check surveillance video films accurately depict her level of functionality and her level of restrictions and limitations."  AR 520.  She stated that she could tell she was having a good day on the day she went for the walk in November because she was walking well and that she was having a good day in all the films because she was out of the house.  If she was having a bad day, she would not be out of the house.

After the approximately four hour interview, the Hartford employee observed the following:

[2]Plaintiff's medical note from July 7, 2003, states, "Ran for local school board in her city and won.  Unfortunately, there is going to be some added stress to her life and it may make her chronic fatigue problem worse."  AR 684.  Although Defendants note that they discovered this through medical records after the interview, Plaintiff does not address her work as a member of the school board in her reply brief.  At the hearing, Plaintiff's counsel provided the Court with Plaintiff's declaration describing her work as a member of the school board.  Plaintiff filed the declaration after the hearing.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8

> Mrs. Thivierge was an active participant in the interview process.  Mrs. Thivierge was attentive and was able to provide cogent responses and answers.  Mrs. Thivierge seemed to be able to concentrate and focus.  I noted that Mrs. Thivierge was able to edit and amend her first statement.  Mrs. Thivierge was able to correct spelling and grammatical errors.  Mrs. Thivierge spent 45 minutes in this process . . . . Mrs. Thivierge cried on two occasions during the interview.  The first one was when she was describing her typical day.  She stated that the reason she was crying is because she remembers what she used to be able to do.  The second time was when she was describing her vertigo . . . . Mrs. Thivierge remained seated during the entire interview.  Only at the end of the surveillance video did Mrs. Thivierge excuse herself to use the restroom.

9
10
11
12

AR 522.  The Hartford employee also noted that the interview was not yet complete when Plaintiff had to leave to accompany a friend to a doctor's appointment.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Following the interview, Hartford arranged for Dr. Alan Kimelman, a Board-Certified Physical Medicine and Rehabilitation Specialist, to examine Plaintiff.  Based on an interview and examination of Plaintiff, her medical records and the surveillance tape, Dr. Kimelman prepared a Long-Term Disability Evaluation dated August 14, 2003.  AR 119-139.  Dr. Kimelman diagnosed Plaintiff with recurrent chronic fatigue symptoms, finding that she did not meet the criteria for establishing the presence of CFS set by the Center for Disease Control.  He noted, "The severity of the condition is episodic with flu-like symptoms, fatigue, muscle pain, nerve pain, diarrhea, nausea, and occasional weight loss occurring paroxysmally and at other times remitting.  Mrs. Ellen Thivierge appears very believable and her medical records corroborate symptoms such as she claims.  Nonetheless, on today's examination, symptoms and findings are minimal." AR 137.  Dr. Kimelman

28

concluded that, although Plaintiff was believable, "her objective factors noted today" show that "Mrs. Ellen Thivierge is able to perform at a sedentary occupation." Id. He checked "Yes" in response to the question, "Has the patient reached maximum medical improvement."

Hartford sent Dr. Kimelman's report to Dr. Ho, along with the video surveillance report and the personal interview report dated February 27, 2005. AR 110-12. Dr. Ho wrote back to Hartford that Plaintiff "has ongoing difficulties with an ill-defined auto-immuno disorder associated with chronic fatigue syndrome and fibromyalgia. She is incapable of performing steady/consistent occupation of any variety for any duration. She continues to require long-term disability." AR 110.

In Hartford's claim log for October 16, 2003, a Hartford employee noted that he "reviewed information with Team Leader L. Torres and he states that there is not enough to terminate claim at this time based on IME by Dr. Kimelman, suggests that we move forward and refer to UDC for review by Internal Medicine physician with a specialty in fibromyalgia and chronic fatigue syndrome." AR 144.

Hartford sent Plaintiff's medical records to the University Disability Consortium (UDC), where Dr. Jerome Siegel, who is certified in Occupational and Internal Medicine, reviewed them. Dr. Siegel also talked with Dr. Ho. In his medical record review of Plaintiff, dated November 23, 2004, Dr. Siegel concluded:

11

**United States District Court**
For the Northern District of California

Based on a review of the medical records, discussion with Dr. Ho and a review of the video surveillance, Ellen Thivierge is a 52-year-old woman with multiple medical problems including chronic fatigue syndrome, fibromyalgia, and a possible undefined connective tissue disease. Ms. Thivierge has been out of work since 8/2/95 and has previously worked as director of organizational development. The medical records support that Ms. Thivierge has had many years of multiple somatic complaints and constitutional symptoms including chronic fatigue, general malaise, diffuse weakness, chronic pain, palpitations, nausea, anxiety, depression, and flu-like symptoms. She has had difficulties with headaches, abdominal cramping, diarrhea, and intermittent cognitive complaints.

The medical records do not clarify what specific functional limitations, if any, Ms. Thivierge has on a regular basis. Dr. Ho indicates that from Ms. Thivierge's self-report, she indicates that she is unable to perform various activities of daily living and instrumental activities of daily living. Despite this, however, he has not been asked to order any visiting nurse or homecare services . . . . He is unaware if she takes regular walks or participates in a gym or health club program. He is unaware if she has had any recent cardiac stress test to give a quantitative estimate of her level of conditioning or fitness. She is seen at regular intervals such as every two to four months, and she travels with her husband five to six hours to continue to follow with Dr. Ho because of the restrictions of her Health Maintenance Organization (HMO). The medical records do not contain any correspondence with the HMO by Dr. Ho recommending Ms. Thivierge be followed closer to her home or be seen by other specialists or therapists in her local area.

Dr. Ho indicates that he is unaware of what Ms. Thivierge does on a typical day. He notes that all of her limitations have been based on her self-report and he himself has not witnessed her being physically unable to perform specific activities. In addition, there is no other information from a physical therapist, occupational therapist, or visiting nurse to corroborate her self-reported problems with diminished activity . . . . The video surveillance does not demonstrate any specific problems with physical functions, difficulties with transfers, mobility, or the use of an assistive device. Although the medical record supports that she has had fluctuating and intermittent levels of fatigue throughout the last eight years, there is no information that Ms. Thivierge has returned to any type of work activities. The independent medical evaluation of 9/4/03, supports that Ms. Thivierge is physically capable of at least sedentary work activities.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      From the review of the video surveillance and medical records, however, it is my opinion that Ms. Thivierge should be physically capable of performing full time sedentary to light duty work activities.  The physical restrictions would include 10-20-lb lifting restriction, alternating sitting and standing, and rotation of job tasks and activities.
      Ms. Thivierge has an unclear prognosis.

AR 95-7.

In Hartford's claim log for November 26, 2003, a Hartford employee noted that he received Dr. Siegel's report finding Plaintiff capable of sedentary work and that "Physician, Dr. Ho, was contacted, and still disagrees that claimant is able to hold down a full-time job, however does not provide any current evidence that supports his opinion.  Claimant lives 6 hours away from physician and only sees him 2-3 times a year."  AR 444.  The employee further noted that he was referring Plaintiff's case to the rehabilitation department for an employability analysis.

A Rehabilitation Clinical Case Manager prepared an employability analysis report based on Plaintiff's physical capacities as determined by Dr. Siegel and Dr. Kimelman, and her education and work history.  The report determined that there were seven suitable occupations for Plaintiff, including her previous occupation.  AR 76-92.

On December 16, 2003, Hartford terminated Plaintiff's long-term disability benefits.  AR 66.  The ten-page termination letter concluded that the weight of the medical evidence in Plaintiff's file supports that Plaintiff is capable of full-time sedentary level work.  It noted that, although she may have some limitations regarding her physical abilities, those limitations are not to a

13

degree that prevents her from gainful employment.  The letter cited
the Independent Medical Examination performed by Dr. Kimelman and
the medical records review performed by Dr. Siegel, both of which
found that Plaintiff should be able to perform a sedentary level
occupation, and then stated, "Dr. Ho does not provide us with
sufficient rationale to support your inability return [sic] to work
in a sedentary level occupation."

Plaintiff appealed the denial of her claim.  AR 609-617.  She
submitted additional medical records and reports from Dr. Ho and
Dr. Lowe, articles regarding chronic fatigue syndrome and
declarations from her friends and family attesting to her
disability.  AR 618-806.  In support of her appeal, Dr. Ho wrote:

> The nature of Ellie's condition is that of an
> unpredictable and uncontrollable relapse into a
> severely weakened, debilitated and exhausted state that
> often times renders her bedbound or housebound.  Such a
> condition usually lasts at least 1-2 weeks.  No
> employer can tolerate that type of inconsistent
> attendance and loss of productivity.  The only
> predictable aspect of her condition is that whenever
> she overextends her capabilities and endurance, she
> will be extremely weakened and afflicted for a number
> of days.  These innumerable episodes of affliction are
> well documented in my records.  As even Dr. Kimmelman
> [sic] concludes, her condition is "very believable and
> her medical records corroborate the symptoms such as
> she claims."

AR 620.

Hartford again sent Plaintiff's files, including documents
Plaintiff submitted on appeal, to the UDC, which arranged for Dr.
Thomas Cuevas, who is Board-Certified in Internal Medicine, to
review them.  AR 1201.  Dr. Cuevas was instructed to review medical
records, surveillance evidence, accompanying reports and the
Claimant Interview and to contact Drs. Ho and Lowe to discuss

United States District Court

For the Northern District of California

Plaintiff's condition and level of functionality.  Dr. Ho, however, would not speak to Dr. Cuevas about his patient's medical condition without her lawyer present.  AR 1202.  Dr. Cuevas spoke with Dr. Lowe, who stated that Plaintiff "had more than just fibromyalgia." AR 1219.  Dr. Lowe described Plaintiff's condition as a "lupus-like syndrome" that manifests polyarthralgias and elevated ANA, and stated that he would expect Plaintiff to have a difficult time working.  When asked about specific restrictions and limitations, Dr. Lowe indicated that was a controversial issue in conditions, like Plaintiff's, involving chronic fatigue and fibromyalgia.  Dr. Lowe stated that "it was very difficult to prescribe restrictions and limitations and he stated that he had no opinion regarding her restrictions and limitations."  AR 1219.

In his September 14, 2004 report, Dr. Cuevas concluded that the medical findings supported the diagnostic classification of chronic fatigue syndrome.  AR 1220.  But he also concluded that "the medical findings do not support impairment in the ability to perform sedentary work on a full-time basis." AR 1221.  Before reaching his conclusion regarding Plaintiff's ability to work, Dr. Cuevas noted:

> In this case, although there is very little information to establish her activity level as far as any information that can be gained from the medical findings, there is a consistent report of difficulty with activity on a consistent basis to provide support for an initial period of impairment. . . . Although it is repeatedly reported that her condition is fluctuating and unpredictable, the claimant was reported to have "run for a local school board in her city and won." Thus, she elected to involve herself in activities which required future planning and commitments.  Thus, the records of medical encounters and office visits offer no information with which to measure her activity level.

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8

In such situations where the activity level cannot reasonably be determined from the clinical information, non-medical surveillance may be of value.  In this case, non-medical evaluation conducted on six different days showed her actively performing activities of daily living without any observable impairment and showed her walking for one hour without any visible impairment during the entire time that she walked for that reported hour.  To the extent that the time she was placed under surveillance are [sic] a representative example of her activity level and as she reported that she only goes out on good days, the medical findings support her ability to engage in activities of daily living without impairment and supports [sic] the ability to work without restrictions at least at a sedentary level on a full-time basis.

9
AR 1220-21.

10

11   On September 17, 2004, Hartford completed its review of

12   Plaintiff's appeal.  It upheld its former determination that

13   effective December 16, 2003, Plaintiff "no longer satisfies the

14   policy's definition of disability."  AR 1131-35.

15                          LEGAL STANDARD

16   ERISA provides Plaintiff with a federal cause of action to

17   recover the benefits she claims are due under the LTD Plan.  29

18   U.S.C. § 1132(a)(1)(B).  The standard of review of a plan

19   administrator's denial of ERISA benefits depends upon the terms of

20   the benefit plan.  Absent contrary language in the plan, the denial

21   is reviewed under a _de novo_ standard.  Firestone Tire & Rubber Co.

22   v. Bruch, 489 U.S. 101, 115 (1989).  However, if "the benefit plan

23   expressly gives the plan administrator or fiduciary discretionary

24   authority to determine eligibility for benefits or to construe the

25   plan's terms," an abuse of discretion standard is applied.  Id. at

26   102; Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1471 (9th

27   Cir. 1993).  The Ninth Circuit has also referred to this as an

28
                                  16

"arbitrary and capricious" standard.  McKenzie v. Gen. Tel. Co. of
Cal., 41 F.3d 1310, 1314 & n.3 (9th Cir. 1994); Taft, 9 F.3d at
1471 n.2 (use of the term "arbitrary and capricious" versus "abuse
of discretion" is a "distinction without a difference").

                              DISCUSSION

I.   Standard of Review

     Plaintiff argues that, because the LTD Plan did not explicitly
reserve discretion to Defendants, the Court should review de novo
Defendants' denial of her benefits.  Defendants respond that the
LTD Plan did confer discretionary authority on them, and their
determination should be reviewed for abuse of discretion.

     The General Provisions in Section VI of the Group Benefits
Plan include the following: "Hartford has full discretion and
authority to determine eligibility for benefits and to construe and
interpret all terms and provisions of the Group Insurance Policy."
AR 599.  There is no question that this language confers
discretionary authority.  But, as Plaintiff notes, this language is
not found in the section for long-term disability benefits;
instead, it is contained in the life insurance benefits section.
Plaintiff asserts that this language conferring discretionary
authority applies to life insurance claims only, and not to long-
term disability claims.  According to Plaintiff, the language that
applies to long-term disability claims, and is appropriately found
in the long-term disability benefits section, provides, "Hartford
reserves the right to determine if proof of loss is satisfactory."
AR 587.

     Defendants respond that the "General Provisions" language

                                 17

applies to all claims for long-term disability benefits as well as life insurance benefits. They note that the Group Benefits Plan covers both disability claims and life insurance claims and contains only one General Provisions section. The Group Benefits Plan likewise contains only one ERISA section setting forth Plaintiff's rights and, because that applies to both long-term disability benefits and life insurance benefits, Defendants argue that the General Provisions section applies to both long-term disability benefits and life insurance benefits as well.

These arguments, however, are unpersuasive. As Defendants note, under the federal common law of ERISA, terms in ERISA insurance polices must be interpreted "in an ordinary and popular sense," as they would be interpreted by "a person of average intelligence and experience." <u>Padfield v. AIG Life Ins. Co.</u>, 290 F.3d 1121, 1125 (9th Cir. 2002). A person of average intelligence and experience would not think that the General Provisions language, found only in the section discussing life insurance benefits, applies to long-term disability benefits. First, long-term benefits and life insurance benefits are separate sections of the Group Benefits Plan, and each has its own separate, and different, table of contents. AR 578, 589. The language in the claims section of the life insurance plan is completely different from the language in the claims section of the LTD Plan. AR 587, 599. There is no "Exclusions" section in the life insurance benefits portion, but the LTD Plan contains a section for "Exclusions" that clearly applies only to the LTD Plan, and not to the life insurance plan. <u>See</u> AR 587 ("EXCLUSIONS: This plan does

18

not cover and no benefit shall be paid for any Disability which

. . . ." ).  As Plaintiff notes, the "General Provisions" section

appears just above the section entitled "Changing your

Beneficiary," which has nothing to do with a disability claim.  And

the ERISA statement is clearly marked as its own separate section

of the Group Benefits Plan; a person of reasonable intelligence and

experience would not think that the ERISA statement applies only to

the life insurance plan.  Thus, it would be reasonable to interpret

the General Provisions section as applying only to the life

insurance plan.

The Ninth Circuit has made clear that an administrator has

discretion only where discretion is "unambiguously retained."

Kearney v. Standard Ins. Co., 175 F.3d 1084, 1090 (9th Cir.

1999)(en banc); see also Sandy v. Reliance Standard Life Ins. Co.,

222 F.3d 1202, 1207 (9th Cir. 2000).  The Court finds that the

administrator has not unambiguously retained discretion over the

LTD plan based on the discretionary language located in the life

insurance section.

Thus, the Court now turns to the language found in the LTD

Plan itself to determine whether that language is unambiguous.

Plaintiff argues that the language, "Hartford reserves the right to

determine if proof of loss is satisfactory," is similar to language

the court reviewed in Sandy.  In Sandy, the court held that a plan

provision requiring a participant to "submit satisfactory proof of

total disability" to the plan administrator did not unambiguously

confer discretion under Kearney.  222 F.3d at 1204.  The court

stated that "unlike other plan provisions we have held conferred

19

discretion," the plan in question provided "no language conferring authority on Reliance to determine eligibility, to construe the terms of the Plan, or to make a final and binding decision."  <u>Id</u>. at 1205.

Defendants correctly note that the language in <u>Sandy</u> is different because, here, Hartford states that it "reserves the right to determine if proof is satisfactory."  In <u>Sandy</u>, the plan only required the claimant to submit satisfactory proof. Defendants argue that the language here makes clear to the reader that Hartford will have the right to determine whether a claim is payable.  But they cite no case where a court found similar language in a plan to confer discretion.  As in <u>Sandy</u>, the language here could mean that Hartford reserves the right to determine the forms and supporting documents required for a proof of loss submission.

The language here does not confer discretion to determine eligibility and construe the terms of the plan as clearly as did the language in cases where abuse of discretion review was found. <u>See, e.g.</u>, <u>Jordan v. Northrop Grumman Corp. Welfare Benefit Plan</u>, 370 F.3d 869, 875 (9th Cir. 2004) ("Travelers has the discretion to construe and interpret the terms of the Plan and the authority and responsibility to make factual determinations."); <u>Friedrich v. Intel Corp.</u>, 181 F.3d 1105, 1110 n.5 (9th Cir. 1999) (finding language providing Intel "shall have the sole discretion to interpret the terms of the Plan and to determine eligibility for benefits" sufficient to retain discretion).  And, as the Ninth Circuit has ruled, "Merely using the word 'determine' in the policy

20

United States District Court

For the Northern District of California

does not insure that the denial of benefits will be reviewed for abuse of discretion." Newcomb v. Standard Ins. Co., 187 F.3d 1004, 1006 (9th Cir. 1999).

Here, the language arguably confers discretion; but if "language only 'arguably' confers discretion, then by definition, it does not confer discretion 'unambiguously,' the requirement for deferential review." Green v. Sun Life Assur. Co. of Canada, 383 F. Supp. 2d 1224, 1227 (C.D. Cal. 2005). As the court noted in Sandy, "Neither the parties nor the courts should have to divine whether discretion is conferred. It either is, in so many words, or it isn't." 222 F.3d at 1207. Because the language does not unambiguously "say in sum or substance" that Hartford "has authority, power, or discretion to determine eligibility or to construe the terms of the Plan, the standard of review will be de novo." Id.

II. De Novo Review

Defendants argue that, even under a de novo standard, their decision to terminate Plaintiff's benefits must be upheld, because Plaintiff's claim of total disability from any occupation is not supported by the record. Of the three doctors Defendants rely upon to support their termination of benefits, however, only one, Dr. Kimelman, actually examined Plaintiff. As noted above, Dr. Kimelman found Plaintiff to be believable. He further found that Plaintiff's symptoms on the day he examined her were minimal, and that her objective factors noted on the day he examined her would allow her to perform a sedentary occupation. Dr. Kimelman's report was clear that his finding, that Plaintiff could return to work in

21

United States District Court

For the Northern District of California

a sedentary occupation, was based on how Plaintiff was feeling and performing on that day. <u>See</u> AR 137 ("on today's examination"; "her objective factors noted today"). But, as explained by the Third Circuit, "CFS does not disable an individual afflicted with it from performing particular, isolated activities, but rather prevents him from performing all activities for any <u>prolonged period of time</u>." <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 441 n.7 (3d Cir. 1997) (emphasis in original). Dr. Kimelman was silent regarding whether Plaintiff could perform any of the objective functions over a prolonged period of time, as were the other two doctors Defendants hired to review Plaintiff's records.

The doctors noted that Plaintiff was observed on the video surveillance walking, driving and doing errands; however, doing those activities for a couple of hours on five out of the six days she was under surveillance does not mean that Plaintiff is able to work an eight-hour a day job. Attending a two-hour weekly committee meeting for ten consecutive weeks is not equal to working eight-hours a day, five days a week, week after week, month after month. Nor is sitting attentively for four hours while being interviewed and then going with a friend to the doctor the equivalent of working on a full-time basis.

Defendants acknowledged at the hearing that Plaintiff would still be "totally disabled" under the LTD Plan if she could work four hours a day; Plaintiff is totally disabled unless she is able to work full-time in "any occupation," for which she is, or could be, qualified. But the two doctors who reviewed Plaintiff's records, and did not examine Plaintiff, offered no convincing

United States District Court

For the Northern District of California

evidence to show that Plaintiff could work an eight-hour day, even at a sedentary job. Dr. Siegel stated that Dr. Kimelman's medical evaluation of Plaintiff supports that she is capable of sedentary work; however, as discussed above, that report was based only on Plaintiff's symptoms on that particular day and did not discuss Plaintiff's abilities to perform objective functions for any prolonged period of time. Based on his review of the medical records and the surveillance video, Dr. Seigel further concluded Plaintiff should be physically capable of performing full-time sedentary to light duty work activities. Reviewing the Plaintiff's medical record and watching the surveillance tape, the Court did not reach the same conclusion.

Dr. Cuevas relied, in part, upon a note in Plaintiff's medical record that Plaintiff ran for the local school board and won, to support his conclusion that Plaintiff has the ability to work without restrictions at a sedentary level on a full-time basis. Dr. Cuevas surmised that because Plaintiff was on the local school board, "she elected to involve herself in activities which required future planning and commitments." Campaigning for and working on the local school board, however, is not a forty-hour a week job. Before deciding to run for the local school board, Plaintiff learned that there would be three to four meetings a month and reading/studying at home. Her campaign consisted of sending by email a flyer made by a friend. Plaintiff thought that she could read and study while lying down at home and could physically handle one meeting a week. But sometimes she could not, and had to reschedule meetings. Other times, she would be in bed all day

**United States District Court**

For the Northern District of California

1  before a meeting, go to the meeting, and then come home and go

2  right back to bed.  After a year, Plaintiff resigned from the

3  school board because she could no longer physically do the job.[3]

4      The Court does not find Drs. Kimelman, Siegel and Cuevas'

5  conclusions that Plaintiff is capable of working full-time

6  persuasive; Dr. Ho's conclusion that Plaintiff cannot work full-

7  time, however, is persuasive, as are Dr. Lowe's conclusion that

8  Plaintiff would have a difficult time working and Dr. Kimelman's

9  conclusion that Plaintiff is believable.  Defendants correctly note

10  that the Supreme Court rejected the "treating physician rule,"

11  which required that special deference be given to the opinion of a

12  treating physician.  See Black and Decker v. Nord, 538 U.S. 822

13  (2003).  However, the Ninth Circuit has held, following the Supreme

14  Court's decision in Nord: "On de novo review, a district court may,

15  in conducting its independent evaluation of the evidence in the

16  administrative record, take cognizance of the fact (if it is a fact

17  in the particular case) that a given treating physician has a

18

19      [3] Defendants object to Plaintiff's declaration, which contains
this information regarding Plaintiff's work on the local school
20  board.  They argue that the declaration is inadmissible because the
Court's review should be limited to a review of the administrative
21  record.  The Ninth Circuit instructs that a district court should
exercise its discretion to consider information not in the
22  administrative record "only when circumstances clearly establish
that additional evidence is necessary to conduct an adequate de
23  novo review of the benefit decision."  Mongeluzo v. Baxter Travenol
Long Term Disability Ben. Plan, 46 F.3d 938, 944 (9th Cir. 1995).
24  Here, it is necessary to consider Plaintiff's declaration.
Defendants never investigated Plaintiff's work on the school board.
25  Nor did they ask her about it.  Instead, as Plaintiff notes,
Defendants denied her appeal, based in part on a single line in Dr.
26  Ho's medical notes, and then closed her file.  Plaintiff was never
given an opportunity to explain and thus the record is devoid of
27  any information regarding Plaintiff's work on the school board.
Defendants' objection is overruled.

28

**United States District Court**
For the Northern District of California

greater opportunity to know and observe the patient than a physician retained by the plan administrator." Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan, 349 F.3d 1098, 1109 (9th Cir. 2003)(quotations omitted). Plaintiff has been a patient of Dr. Ho for over twenty-years. The Court is not convinced that, because Plaintiff lives in Oregon and Dr. Ho practices in California and does not know what Plaintiff does every day, Dr. Ho's assessment of Plaintiff should be discounted. Plaintiff provided to Hartford and Dr. Kimelman valid reasons for traveling to California to see Dr. Ho.

Plaintiff's affliction and inability to work in any occupation is well-documented in Dr. Ho's records and the administrative record. Approximately three month before Defendants terminated Plaintiff's benefits, even Hartford agreed with Dr. Ho's assessment. A September 12, 2003 note from Hartford's Summary Detail Report states: "Med info supports that EE continues to remain TD any occ due to chronic fatigue syndrome. AP has indicated that on a good day, EE has cap. for physical act, and too much act. results in worsening of sx." AR 46. And, a month after that note, Hartford employees concluded that, even with Dr. Kimelman's report, there was not enough to terminate Plaintiff's claim.

As Plaintiff notes, there has been no significant change in her condition. She still has good days, when she can function, and bad days, when she cannot function. It is unpredictable whether Plaintiff will have a good day or a bad day, and, as Dr. Ho notes, the bad days can continue for up to two weeks. A full-time

1  employer cannot handle such inconsistent attendance and
2  unpredictability.

3      In reviewing all of the evidence in the administrative record,
4  as well as Plaintiff's declaration, the Court finds that Plaintiff
5  is entitled to an award of benefits.

6                          CONCLUSION

7      For the foregoing reasons, the Court GRANTS Plaintiff's motion
8  for judgment by the Court (Docket No. 22) and DENIES Defendants'
9  cross-motion for judgment (Docket No. 26).  Plaintiff shall recover
10 her costs of action from Defendants.  Judgment shall enter
11 accordingly.

12     IT IS SO ORDERED.

13

14 Dated:  3/28/06

15                                        _____
16                                        CLAUDIA WILKEN
                                          United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California